1

2

3

4

5

6

7

8                           IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DANIEL K. CHESTANG,

11                   Petitioner,                    No. CIV S- 07-1173 LKK GGH P

12          vs.

13   D.K. SISTO, Warden,                    _____

14                   Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17              Petitioner, a state prisoner proceeding with retained counsel, has filed a petition

18   pursuant to 28 U.S.C. § 2254.  Pending before the court is respondent's August 8, 2008, motion

19   to dismiss, which came on for hearing on April 2, 2009, with David A. Eldridge representing

20   respondent and Randall Ensminger appearing for petitioner.[1]  This case currently proceeds upon a

21   second amended petition filed on April 18, 2008.[2]  Petitioner pled guilty to two counts of murder

22   (Cal. Penal Code § 187), admitted to use of firearm enhancements (Cal. Penal Code § 12022.5)

23

24        [1] On July 9, 2009 (docket # 68), the undersigned expanded the record to include the
     preliminary hearing transcript filed by respondent on April 1, 2009 (docket # 67), the day before
25   the hearing, and granted petitioner ten (10) days to file any response, after which a further
     extension of time was granted, and the response was filed on July 31, 2009 (docket # 72).

26        [2] See Order, filed on April 25, 2008 (docket # 43).

                                                    1

1   and was sentenced in Sacramento County Superior Court, on March 18, 1994, to a term of 60

2   years to life, which included a total of a ten-year determinate sentence for the enhancements to be

3   followed by two consecutive indeterminate 25-year-to-life terms.  Second Amended Petition

4   (SAP), p. 2; Motion to dismiss (MTD), p. 1, citing Lodged Doc. 1.  Petitioner challenges his

5   sentence upon the following grounds: 1) illegal sentence; 2) ineffective assistance of counsel; 3)

6   conviction arising from unlawfully induced or involuntary guilty plea, made without

7   understanding of the nature of the charge and the plea consequences.  SAP, pp. 6-19.

8   Motion to Dismiss

9          Pending before the court is respondent's motion to dismiss the petition, alleging

10  that the petition was not filed timely.  The statute of limitations for federal habeas corpus

11  petitions is set forth in 28 U.S.C. § 2244(d)(1):

12          A 1-year period of limitation shall apply to an application for a writ
            of habeas corpus by a person in custody pursuant to the judgment
13          of a State court.  The limitation period shall run from the latest of–

14          (A) the date on which the judgment became final by the conclusion
            of direct review or the expiration of the time for seeking such
15          review;

16          (B) the date on which the impediment to filing an application
            created by State action in violation of the Constitution or laws of
17          the United States is removed, if the applicant was prevented from
            filing by such State action;
18
            (C) the date on which the constitutional right asserted was initially
19          recognized by the Supreme Court, if the right has been newly
            recognized by the Supreme Court and made retroactively
20          applicable to cases on collateral review; or

21          (D) the date on which the factual predicate of the claim or claims
            presented could have been discovered through the exercise of due
22          diligence.

23          As noted, petitioner was sentenced to a term of 60 years to life on his guilty plea

24  and admission of sentencing enhancements on March 18, 1994.  Respondent's Lodged Doc. 1.

25  \\\\\

26  \\\\\

1   Since petitioner did not appeal,[3] his conviction became final 60 days later, on May 17, 1994.[4]

2   See Cal. R. Ct. 8.308(a) (formerly Cal. R. Ct. 30.1).  As respondent observes, petitioner's

3   conviction became final before April 24, 1996, the effective date of the AEDPA statute of

4   limitations; therefore, petitioner's federal petition was due one year from the effective date of the

5   implementation of the statutory limitation period, and, absent any applicable tolling, would have

6   been due by April 24, 1997.  MTD, p. 4,[5] citing, inter alia, Miles v. Prunty, 187 F.3d 1104, 1105

7   (9th Cir. 1999); Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001).

8          There is no dispute as to when the nine post-conviction state court habeas

9   petitions were filed: the first petition, filed in the Sacramento County Superior Court, was not

10  filed until May 20, 2004, and was denied on June 23, 2004.  The second petition was filed in the

11  same court on July 28, 2004, and denied on September 17, 2004; on October 15, 2004, petitioner

12  filed a motion for reconsideration in the Sacramento County Superior Court which was denied on

13  Oct. 27, 2004; petitioner also filed a motion for reconsideration on Nov. 15, 2004, which was

14  denied on the same day.  The third petition was filed on Oct. 18, 2004, in the Third District Court

15  of Appeal, and denied on Oct. 21, 2004.  The fourth petition was filed in Sacramento County

16  Superior Court on June 6, 2005, and denied on July 25, 2005.  The fifth petition was filed on

17  Aug. 22, 2005, in the Third District Court of Appeal, and denied on Aug. 25, 2005.  The sixth

18  habeas petition was filed in Sacramento County Superior Court on Nov. 7, 2005, and denied on

19  Dec. 13, 2005.  The seventh state court petition was also filed in the Sacramento County Superior

20

21          [3] See second amended petition (SAP), pp. 2, 14.

22          [4] Petitioner appears to have filed a "writ of error coram nobis" before the Sacramento
    County Superior Court on May 5, 1995, which was returned to him by a letter dated May 16,
23  1995, evidently signed by Judge Robie, the presiding judge, indicating that any such petition
    must be submitted on the appropriate form and apparently enclosing such form.  Lodged Doc. 30.
24  Should petitioner use the form, according to the letter, his petition would be considered.  There is
    no indication that any such corrected filing was made.
25
26          [5] Respondent actually accords petitioner until April 25, 1997, for filing of the federal
    petition; however, the applicable date, under Patterson v. Stewart, supra, is April 24, 1997.

3

1  Court on Feb. 8, 2006, and was denied on March 17, 2006; petitioner's April 11, 2006, motion

2  for reconsideration in the same court was denied on May 4, 2006.  The eighth petition was filed

3  in the Third District Court of Appeal on July 31, 2006, and denied on Aug. 3, 2006.  The ninth

4  and final petition was filed in the California Supreme Court on Sept. 15, 2006, and denied on

5  March 21, 2007.  MTD, pp. 2-3, Lodged Docs. 2-25 ; SAP, pp. 18-19.  The court will find that

6  the instant action commenced on June 10, 2007, by application of the mailbox rule,[6] even though

7  petitioner's initial pro se filing was an inapposite motion for relief from judgment.  See Order,

8  filed on June 25, 2007 (docket # 3).

9          28 U.S.C. § 2254(d)(2) provides that the time during which a properly filed

10  application for state post-conviction or other collateral review with respect to the pertinent

11  judgment or claim is pending shall not be counted toward any period of limitation under this

12  section.  However, as respondent notes (MTD, p. 6), the filing of a state collateral action

13  following expiration of the AEDPA limitations period cannot revive the limitations period or toll

14  it under § 2254(d)(2).  See Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir.2003); Jiminez v.

15  Rice, 276 F.3d 478, 482 (9th Cir.2001).  Thus, on the face of it, the instant filing due by April 24,

16  1997, but not filed until June 10, 2007, would appear to be untimely by some ten years.

17  Although unnecessary on this showing, respondent makes an alternate argument as to why the

18  state habeas petitions could not have tolled the AEDPA statute.  MTD, p. 5.  He contends that the

19  first and sixth through ninth petitions were determined to be untimely in the state courts.  The

20  first and ninth petitions were denied by citation to, inter alia, In re Robbins, 18 Cal.4th 770, 780

21  [,77 Cal. Rptr. 153] (1998).  Lodged Docs. 3, 25.  The sixth and seventh petitions were found

22  untimely filed by the Sacramento County Superior Court.  Lodged Docs. 17, 19.  Thus, as

23  respondent argues, these petitions, having been expressly found to have been filed untimely,

24  cannot have been "properly filed" pursuant to § 2244(d)(2).  MTD, p. 5, citing Pace v.

25  _____

26    [6] Pursuant to Houston v. Lack, 487 U.S. 266, 275-76, 108 S. Ct. 2379, 2385 (1988) (pro
se prisoner filing is dated from the date prisoner delivers it to prison authorities).

1  DiGuglielmo, 544 U.S. 408, 414, 417, 12 S. Ct. 1807, 1812, 1814 (2005) (holding "[w]hen a

2  postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes

3  of § 2244(d)(2)," expressly finding that a state court petition rejected as untimely is not "properly

4  filed" under AEDPA statute tolling provisions).   Respondent argues that while the eighth

5  petition was denied without comment or citation (Lodged Doc. 23), it should not be presumed

6  that the prior state court findings of untimeliness were thereby disregarded, citing Ylst v.

7  Nunnemaker, 501 U.S. 797, 803-806, 111 S. Ct. 2590 (1991), for the proposition that the later

8  reviewing courts did not silently disregard the last reasoned opinion that the claim was

9  procedurally defective.   Thus, it is appropriate to "look through" unexplained orders "to the last

10  reasoned decision...." Id., at 804, 111 S. Ct. 2590.

11          Respondent is correct on the law in his alternate argument.  Pace, supra, at 417,

12  125 S. Ct. at 1814 (state "time limits no matter their form, are 'filing' conditions" ); Bonner v.

13  Carey, 425 F.3d 1145, 1149 (9th Cir. 2005) ("[b]ecause the California courts dismissed Bonner's

14  petition as untimely, his petition was not 'properly filed' under AEDPA").  However, as noted, it

15  is unnecessary to invoke the argument, given that, on the face of it, petitioner permitted the

16  AEDPA statutory period to expire by more than seven years before even commencing the filing

17  of his state court petitions.

18  Equitable Tolling/Delayed Trigger for Commencemnt of Limitations Period/Actual Innocence

19          Apparently anticipating the arguments for untimeliness, petitioner within the

20  second amended petition, asserts that his petition includes a claim of factual innocence based on

21  newly discovered evidence – a statement by the co-defendant – resulting in a miscarriage of

22  justice and that he has been diligently pursuing state court relief since obtaining the evidence and

23  is thus entitled to equitable tolling from the date of his first state court petition, filed on May 20,

24  2004.[7]  In addition, petitioner avers that he did not learn of the defect in his sentence related to a

25  _____

26      [7] Petitioner here does not appear to expressly seek any equitable tolling for all the time
passed until the filing of the initial state court petition.  However, in his declaration in opposition

5

psychological report by Dr. Shawn Johnston until he learned of his potential life sentence on

November 13, 2003.  Thus, he claims that the first factual predicate of his claim did not become

known to him until November of 2003, the second factual predicate involved obtaining the June

13, 2004 statement of culpability and exoneration from the co-defendant; and the third factual

predicate, learned some time prior to November 15, 2004, when he filed his motion for

reconsideration, was petitioner's discovery of the sentencing judge's illegal sentence resulting

from the judge's rejection of Dr. Johnston's psychological report of petitioner.  SAP, 14-15.

Therefore, petitioner, in addition to seeking equitable tolling, appears to seek a later trigger date

for the commencement of the statutory limitation period under § 2244(d)(1)(D), in asserting that

he was unaware of even the first factual predicate of his claims until November of 2003.

　　　　The court will analyze the above assertions below.  However, prior to that

analysis, it is necessary to emphasize that not every factual assertion, or dispute, will require an

evidentiary hearing.  The Supreme Court has recently opined on the standards for granting an

evidentiary hearing in Schriro v. Landrigan, 550 U.S. 465, 473-74, 127 S. Ct. 1933, 1939-1940

(2007), reversing Landrigan v. Schriro, 441 F.3d 638, 650 (9th Cir. 2006) (en banc).  Schriro

first described the familiar test for granting an evidentiary hearing: that if the factual allegations

were to be proved, petitioner would be entitled to relief.  See Alberni v. McDaniel, 458 F.3d 860,

873 (9th Cir. 2006).[8]  These standards are easily applied to factual issues involving a dispositive

---

to the motion to dismiss (¶ 5), petitioner does state that he should be granted equitable tolling
"from and after the date" of what he terms his "first rejected appeal," a filing made in May of
1995 (see footnote 4 above and discussion below), submitted before the statute of limitations had
even commenced.

　　[8]  The Ninth Circuit in Landrigan had reduced the test even further – "[w]e conclude
Landrigan has alleged facts that, if demonstrated to be true, present a *colorable* claim that he
received ineffective assistance of counsel..... Id at 650 (emphasis added).  Thus, district courts
were to hold evidentiary hearings not only in cases where the facts, if proven, would entitle the
petitioner to relief, but in any case where the petitioner had "surpassed the relatively 'low bar' of
alleging a colorable claim for relief."  Id.  Under such a test, evidentiary hearings would be
required in nearly every habeas case presented to federal court in which ineffective assistance or
some other extra-record claim was made.

1   procedural issue as well.  That is, do petitioner's allegations, if proven, give rise to equitable

2   tolling or a later commencement of the limitations period; if so, petitioner would be entitled to an

3   evidentiary hearing.

4            However, in determining whether relief could be granted, the federal court must

5   apply the AEDPA deferential standards to legal and factual questions necessarily reached by the

6   state courts which might obviate the need for an evidentiary hearing.  <u>Schiro</u>, 127 S. Ct. at 1939-

7   40.  If the state court had made factual findings on the issue at bar, no evidentiary hearing could

8   be held unless petitioner's proffer would constitute clear and convincing evidence.  Importantly,

9   *if the record refuted the applicant's allegations, i.e., petitioner was making allegations at odds*

10   *with the established facts of the record, he would not be permitted an evidentiary hearing unless*

11   *such new facts would clearly and convincingly rebut the record.*  Generally phrased allegations,

12   or the failure to submit a proffer of available, specific proof will not clearly and convincingly

13   rebut the record.  Of course, if a lower state court is the court which issued a reasoned decision,

14   the federal courts look through silent denials and assume the reasoning of the lower court is the

15   reasoning of all courts.  <u>Medley v. Runnels</u>, 506 F.3d 857, 862-863 (9th Cir. 2007), citing <u>Ylst v.</u>

16   <u>Nunnemaker</u>, 501 U.S. 804-06, 111 S. Ct. 2590 (1991).

17            The following discussion demonstrates that the factual record in this case clearly

18   refutes petitioner's latter day allegations, and an evidentiary hearing is not warranted.

19       *Sentencing Allegation*

20            The writ of error coram nobis filed by petitioner, on May 5, 1995, that was

21   evidently rejected pending his use of the appropriate form (see footnote 3), clearly states that

22   petitioner was sentenced to two consecutive terms of 25 years to life, enhanced by 10 years, "the

23   aggregate term being 60 years to life affixed."  Lodged Doc. 30 (p. 2).  In his opposition,

24   petitioner declares that he should be granted equitable tolling from and after the date of this

25   "rejected appeal," which "was attempted to be filed before the statute of limitations even had

26   begun to run" even though "he had nothing to do with the actual preparation" of the document,

only signing it after a jailhouse lawyer had prepared it.[9]  Petitioner's Declaration in Opp., ¶ 5. At

oral argument, petitioner's counsel again maintained the 1995 petition was prepared by a

jailhouse lawyer and petitioner forgot it had ever been done.  Moreover, petitioner maintains that

he was "only 18 at the time and was suffering from untreated schizophrenia, was in shock from

[his] imprisonment and not fully understanding what had happened to [him]."[10]  Ptnr's Dec. in

Opp., ¶ 5.  However, petitioner had multiple opportunities both before and after May of 1995 and

prior to May of 2004, when he filed his first state court petition, to appreciate the magnitude of

his sentence, beginning with the occasion on which he entered his change of plea on December 9,

1993 (Lodged Doc. 32, p. 5: 11-21),[11] and later at the time of his judgment and sentencing on

March 18, 1994, before a different judge (Lodged Doc. 33, pp. 23-26).[12]  As the undersigned

noted at the hearing on this motion, the sentencing judge was vehement in expressing his desire

for the sentence to be lengthy.  Moreover, the record indicates that the judge told petitioner

explicitly when sentencing him:

> It's my desire that by the time you are eligible for parole I will be
> nothing more than what I hope is a warm feeling in the hearts and
> minds of my children and grandchildren.

Lodged Doc. 33, p. 24:23-26.

---

[9]  In May of 1995, of course, the AEDPA had not even been implemented.

[10]  Assuming his birthdate, August 18, 1974, has been recorded correctly in the records, petitioner was 18 at the time of his arrest on June 3, 1993; he was 19 when he entered his plea on Dec. 9, 1993, and, of course, when he was sentenced on March 18, 1994; at the time of the coram nobis petition filing, on May 5, 1995, therefore, petitioner was not 18, but would have been nearing his 21st birthday.  Lodged Docs. 1, 32.

[11]  On the date that he changed his plea, he was told by the judge who accepted the plea: "The potential sentence for each of these murders is twenty-five years to life in prison.

The potential prison term for the enhancement of personally using a firearm on each of the murder charges is an additional five years consecutive.

You are receiving no bargain with regards to this plea.  You're potentially facing fifty years to life in prison, plus an additional ten years for the arming allegations."  Lodged Doc. 32, p. 5: 11-19.  Petitioner, when asked if he understood the potential sentence he faced, replied: "Yes, I do."  Id., p. 5: 20-21.

[12]  Petitioner's sentence was explicated in detail and summarized as "[t]he aggregate term in state prison in your case, the determinant sentence of ten years in prison to be followed by two consecutive twenty-five years to life sentences."  Lodged Doc. 33, p. 24:19-22.

1       Should that sentiment have left even the slightest doubt as to the judge's intent in

2 imposing petitioner's sentence, it would have been removed by his conclusion at the sentencing

3 hearing for both petitioner and his co-defendant:

> If you are ever placed on parole on this case it will be for a period
> of life.  And if you violate any provision of your parole, you could
> be returned back to prison for life.
>
> However, it's my desire that you never be granted parole.  I believe
> you should spend the rest of your natural lives in prison and die in
> prison.

8 Id., at 26:4-9.

9       Petitioner was a high school graduate, as the court noted at the hearing.  Lodged

10 Doc 27.  In addition to that, there is ample evidence in the record submitted by respondent to

11 demonstrate that legal status summary sheets were prepared from the inception of his

12 imprisonment, indicating that he was sentenced to a term of 60 years to life, despite petitioner's

13 representation that he cannot recall any intake report dated April 28, 1994, or any intake audits

14 during prison transfers where his life sentence was discussed, maintaining specifically that he

15 cannot recall ever having seen the May 16, 1994, Legal Status Summary Report, setting forth his

16 life sentence.  Lodged Docs. 28, 29, 35; petitioner's Declaration in Opp., ¶¶ 7-8.  Even if, as his

17 counsel maintained at the hearing, petitioner believed his sentence translated to 50 years at hard

18 labor, or in the alternative, as petitioner states in a declaration appended to the opposition (¶ 9),

19 that he believed that so long as he "had no other problems" in prison, his 60-year sentence would

20 be halved by good time credits, there is simply no realistic possibility that petitioner could have

21 failed to understand, virtually from the outset, the sentence he had received absent a willful

22 decision simply not to acknowledge reality or evidence of a completely delusional state of mind,

23 for which evidence is lacking.  The record also includes a copy of a letter, dated April 10, 1995,

24 apparently from petitioner to his defense counsel, wherein petitioner states, in part, the following:

> The goal of my plea was for the reciprocal benefit of 60 years, and
> not to the false enchantment [sic] of two terms of twenty-five years
> to life....The sentence rendered 2 (two) life terms which I was

1          unaware of before the plea of guilty.

2    Lodged Doc. 26.

3          This appears to be a clear indication that petitioner was fully cognizant of the

4    sentence imposed upon him by no later than spring of 1995.[13]  In order to avail himself of the

5    commencement date of § 2244(d)(1)(D), petitioner must have exercised due diligence in

6    determining the factual predicate of his claim; a claim that petitioner only discovered the true

7    significance of his 1994 sentence in November of 2003, while conducting his own research in a

8    prison law library does not demonstrate such due diligence.  The superior court's assertion made

9    on June 23, 2004, in denying the May 20, 2004, petition wherein petitioner seeks to convince that

10   court that he had only just discovered that he had received a life sentence in 1994 based on a

11   November 13, 2003, prison document, is self-evident; noting the document, the superior court

12   found that it "could not have been the first notice petitioner ever received that he is serving a life

13   term."  Lodged Doc. 3.  Any other conclusion defies logic.  To the extent that any of petitioner's

14   claims rest on this court's finding timeliness due to his belated discovery of the sentence imposed

15   upon him, delayed by almost ten years after the sentence was imposed, such claims cannot be

16   found timely under § 2244(d)(1)(D), nor is any showing of equitable tolling thereby warranted.

17   _____

18         [13] His counsel, in a response dated April 19, 1995, states that he has received petitioner's
     letter and avers, in relevant part: "I want to advise you that I will not file a declaration that you
19   were unaware of the consequences of your plea of guilty ....because it is my personal recollection
     that you were at all times aware that the consequences of such plea provided a sentence of 60
20   years to life in prison with the possibility of parole, and that a mandatory minimum sentence of
     38 years, 4 months would have to be served before you first became eligible for parole."
21         This recollection is reinforced by a review of my file in which I retained notes of jail
     conferences with you on July 29, 1993, September 14, 1993, and December 1, 1993.  All of the
22   notes set out in specific detail the fact that you were aware of the sentence you would receive
     from the court.
23         As charged by the Sacramento County District Attorney, you were convictable of 2
     counts of first degree murder with the personal use of a firearm, and could have been sentenced
24   to either life in prison without the possibility of parole, or death, after jury trial.  The plea bargain
     entered on your behalf clearly avoided the death sentence or life sentence without the possibility
25   of parole and gave you parole possibility by the time you reach your mid to late 50's."  His
     counsel adds: "Further, the evidence in this case was overwhelming and the most compelling
26   evidence was your own confession of these crimes to 5 or 6 of your closest friends."  Lodged
     Doc. 31.

1    In Calderon v. U.S. District Court (Beeler), 128 F.3d 1283, 1288 (9th Cir. 1997),

2  overruled on other grounds, Calderon v. U.S. District Court for Cent. Dist. of CA. (Kelly), 163

3  F.3d 530 (9th Cir. 1998) (en banc), itself abrogated by Woodford v. Garceau, 538 U.S.202, 123

4  S. Ct. 1398 (2003), the Ninth Circuit found that the statute of limitations could be equitably

5  tolled if extraordinary circumstances beyond a prisoner's control made it impossible to file the

6  petition on time.   "In addition, '[w]hen external forces, rather than a petitioner's lack of

7  diligence, account for the failure to file a timely claim, equitable tolling may be appropriate.'"

8  Lott v. Mueller, 304 F.3d 918, 922 (9th Cir. 2002), quoting Miles v. Prunty, 187 F.3d 1104, 1107

9  (9th Cir. 1999).

10    Equitable tolling will not be available in most cases because tolling should only

11  be granted if extraordinary circumstances beyond a prisoner's control make it impossible for him

12  to file a petition on time.  Beeler, 128 F.3d at 1288-89.  As held in Beeler,  "[w]e have no doubt

13  that district judges will take seriously Congress's desire to accelerate the federal habeas process,

14  and will only authorize extensions when this high hurdle is surmounted." 128 F.3d at 1289.

15  "Mere excusable neglect" is insufficient as an extraordinary circumstance.  Miller v. New Jersey

16  Dept. of Corrections, 145 F.3d 616, 619 (3rd Cir. 1998).  Moreover, ignorance of the law does

17  not constitute such extraordinary circumstances.  See Hughes v. Idaho State Bd. of Corrections,

18  800 F.2d 905, 909 (9th Cir. 1986).

19    In the Calderon (Beeler) case, the Court of Appeals held that the district court

20  properly found equitable tolling to allow Beeler more time to file his petition.  Beeler's lead

21  counsel withdrew after accepting employment in another state, and much of the work he left

22  behind was not usable by replacement counsel – a turn of events over which the court found

23  Beeler had no control.  The Court of Appeals held that the district court properly found these

24  were "extraordinary circumstances" sufficient to toll the statute of limitations.[14]  The Ninth

25

26    [14]  See also Baskin v. United States, 998 F. Supp. 188 (D. Conn. 1998), wherein the court
applied equitable tolling where petitioner's attorney failed to notify him of the denial of a petition

Circuit also found extraordinary circumstances in <u>Calderon v. U.S. Dist. Ct. (Kelly)</u>, <u>supra</u>, 163

F.3d 530.  The three reasons given which independently justified tolling were: a district court

stay which prevented petitioner's counsel from filing a habeas petition, mental incompetency

until a reasonable time after the court makes a competency determination, and the fact that

petitioner did at one time have timely habeas proceedings pending which were mistakenly

dismissed, not as a result of any doing by petitioner.  <u>Id.</u> at 541-42.  <u>See</u> <u>also</u> <u>Corjasso v. Ayers</u>,

278 F.3d 874 (9th Cir. 2002) (clerk's unjustified rejection of a petition justified partial tolling);

<u>Miles v. Prunty</u>, 187 F.3d at 1107 (delay by prison in withdrawing funds from prisoner's trust

account, preparing and mailing filing fee were circumstances beyond his control, qualifying him

for equitable tolling); <u>Stillman v. Lamarque</u>, 319 F.3d 1199, 1202-03 (9th Cir. 2003) (equitable

tolling permitted where litigation coordinator broke a promise to petitioner's counsel to return a

signed petition for timely filing); <u>Spitsyn v. Moore</u>, 345 F.3d 796 (9th Cir. 2003) (sufficiently

egregious misconduct by counsel, such as wholly deficient performance, may justify equitable

tolling).

       "Generally, a litigant seeking equitable tolling bears the burden of establishing

two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary

circumstance stood in his way."  <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418, 125 S. Ct. 1807, 1814;

<u>Miranda v. Castro</u>, 292 F.3d 1063, 1065 (9th Cir. 2002) (a habeas petitioner bears the burden of

proving that equitable tolling should apply to avoid dismissal of an untimely petition).

"Equitable tolling is unavailable in most cases," and is only appropriate "if *extraordinary*

circumstances beyond a prisoner's control make it impossible to file a petition on time."

<u>Miranda</u>, <u>supra</u>, at 1066 (internal quotations/citations omitted [emphasis added in <u>Miranda</u>]).  A

petitioner must reach a "very high" threshold "to trigger equitable tolling [under AEDPA]...lest

the exceptions swallow the rule."  <u>Id</u>

---

for certiorari until thirteen months after the denial was entered.

1    Moreover, as noted above, ignorance of the law has not been found to warrant

2    equitable tolling.  Hughes v. Idaho State Bd. of Corrections, supra, at 909.  In addition, in U.S. v.

3    Van Poyck, 980 F. Supp. 1108, 1110-11(C.D. Cal. 1997), the court found that a petitioner's

4    circumstances were not extraordinary in the following circumstances: inability to obtain

5    transcripts from court reporters, and general prison lockdowns preventing the prisoner's access to

6    the library and a typewriter which were necessary to his motion.  See also Tacho v. Martinez, 862

7    F.2d 1376, 1381 (9th Cir. 1988) (reliance on incompetence of jailhouse lawyer not sufficient to

8    justify cause to excuse procedural default); Turner v. Johnson, 177 F.3d 390, 392 (5th Cir. 1999)

9    (prisoner's unfamiliarity of law did not toll statute); Eisermann v. Penarosa, 33 F.Supp.2d 1269,

10   1273 (D.Haw. 1999) (lack of legal expertise does not qualify prisoner for equitable tolling);

11   Henderson v. Johnson, 1 F.Supp.2d 650, 656 (N.D. Tex. 1998) (same); Fadayiro v. United States,

12   30 F.Supp.2d 772, 779-80 (D.N.J. 1998) (delay in receipt of transcripts does not justify equitable

13   tolling).  Nor has the undersigned ever been persuaded that a petitioner's reliance on a jailhouse

14   lawyer can have been contemplated as coming within the holding of Spitsyn v. Moore, supra.

15   Petitioner's representation that he was not really aware of the actual length of his

16   sentence until he had spent a decade in prison simply does not warrant equitable tolling, given,

17   inter alia, the fact that he had pled guilty to two first degree murders, his presence at his

18   sentencing, the legal status summary sheets prepared, the language in the 1995 coram nobis

19   petition he attempted to file.  The record clearly refutes the latter day allegations.  Moreover, the

20   allegations themselves are insufficient.  In simply asserting that he did not understand his own

21   abortive coram nobis petition, or that he so belatedly discovered the significance of his sentence,

22   petitioner makes a deficient showing to prove entitlement to equitable tolling.  These do not rise

23   to the level of being "extraordinary circumstances"  beyond petitioner's control in an equitable

24   tolling context, but appear, instead, to be attributable, at most, to a lack of diligence.  See, e.g.,

25   Lott v. Mueller, supra, at 922.

26   \\\\\

*Actually Innocent of First Degree Murder*

Nor is petitioner entitled either to the later trigger date of § 2244(d)(1)(D), or to equitable tolling, for what petitioner characterizes as the third factual predicate for his claims, relating to the sentencing judge's rejection of Dr. Johnston's psychological report of petitioner, only learned at some vague period prior to November 15, 2004, according to petitioner.   It is plain that at the judgment and sentencing hearing, at which petitioner was present, the judge discusses Dr. Johnston's psychological evaluation, the testing administered upon petitioner, relates Dr. Johnston's conclusion and the judge's own rejection of that conclusion.[15]

Petitioner's putative schizophrenia, while relied on as part of an underlying claim, does not appear to be an argument for equitable tolling on which petitioner significantly relies, although petitioner does contend that Dr. Johnston prognosticated that petitioner may well suffer from paranoid schizophrenia and that while in prison petitioner has received no mental health treatment.  Of course, this is a double-edged sword: while petitioner argues that he has not received the mental health treatment he needs based on Dr. Johnston's analysis, respondent maintains this simply signifies that prison officials have determined that petitioner is not in need of any such treatment program.  Petitioner points out that the only prison mental health treatment he has received has come in the form of group meetings which have resulted from his request to be enrolled in the CCCMS[16] program while in prison.  Ptn. Dec. in Opp., ¶ 4.  Petitioner, arguing the merits of his claim that the plea was inappropriately accepted because the only professional opinion was that of Dr. Johnston opining petitioner's alleged paranoid schizophrenia with no professional opinion in opposition before the court, appears to conflate the requisite state of mental health for petitioner's plea to be accepted with that of competency to stand trial.  Opp., pp. 2, 11-12.  In support of his claim that the trial court should not have accepted petitioner's

---

[15] The court notes that neither party provides Dr. Johnston's actual psychological evaluation or points to where it might exist in the record before this court.

[16] Correctional Clinical Case Management Services.

1  plea, petitioner cites <u>People v. Harvey</u>, 151 Cal. App.3d 660, 198 Cal. Rptr. 858 (1984), wherein

2  the state appellate court found it to be an abuse of discretion for the trial court to deny the

3  defendant's motion to withdraw the guilty plea where the defendant had not been advised by her

4  counsel before entering the plea that a psychiatrist's professional opinion was that defendant was

5  not mentally capable of "harboring malice, premeditating or deliberating at the time of the

6  killing," a report of which the defendant was evidently unaware until after her sentence and

7  confinement.  <u>People v. Harvey</u>, <u>supra</u>, 151 Cal. App.3d at 665-666.  Petitioner particularly

8  emphasizes the following statement:

9              Even assuming defendant did have knowledge of the consequences
              of her plea, it is clear from the record that she did not have
10             knowledge of a defense, not only potentially meritorious, but
              absolutely critical to her case. [] Thus we conclude that, under all
11             the circumstances of this case, the trial court abused its discretion
              in denying defendant's motion to withdraw her guilty plea.

12

13 Opp., pp. 14-15, quoting <u>People v. Harvey</u>, <u>supra</u>, 151 Cal. App.3d at 670-671.

14 The case appears to be inapposite insofar as a state court abuse of discretion, on the face of it,

15 would not appear to implicate a federal constitutional guarantee, nor is the context analogous,

16 where the defendant in <u>Harvey</u> evidently made a motion to withdraw the plea, something that did

17 not occur here, and timeliness was not at issue.  Nor does the report by Dr. Johnston, as the court

18 stated, as pointedly support the premise as does that of the psychiatrist in <u>Harvey</u>, that petitioner

19 did not have the psychological capacity to commit the murder offense with the requisite intent,

20 where here, according to the sentencing judge, Johnston's opinion as to petitioner was that the

21 "commission of the instant offense was premeditated but not deliberated," (Lodged Doc. 1, p.

22 22), a parsing of the required elements so labored as to render its meaning obscure to the point of

23 meaninglessness.  But petitioner's fundamental difficulty here is that he seeks to reach the merits

24 of his petition without ever having demonstrated a sufficient basis for this court to consider the

25 petition timely.  That is, even if petitioner had a colorable ground with regard to either a claim

26 that the court should have obtained a professional, countervailing opinion to that of Dr. Johnston

1  or that counsel for petitioner was ineffective in not fully informing petitioner of the contents of

2  Dr. Johnston's report, petitioner offers far too little by way of support as to why the court should

3  find petitioner timely in raising these issues for the first time some ten years beyond the date of

4  acceptance of the plea and entry of judgment, particularly as petitioner admits that he knew

5  "prior to sentencing," that the psychologist's report had "included the opinion that I was

6  schizophrenic and as a result incapable of deliberation," but that he did not understand the legal

7  significance of this opinion, nor did his defense attorney explain it to him.  Ptnr's Dec. in Opp., ¶

8  3.   To trigger the later date, it is not necessary that petitioner understand the legal significance,

9  but only that he is aware of the factual predicate of any claim.  Nor does petitioner make the

10  showing required to demonstrate the impediment to earlier filing or the diligence required to

11  show his is a case of an extraordinary circumstance entitling him to equitable tolling.  "Where a

12  habeas petitioner's mental incompetency in fact caused him to fail to meet his AEDPA filing

13  deadline, his delay was caused by an 'extraordinary circumstance beyond [his] control,' and the

14  deadline should be equitably tolled."  Laws v. LaMarque, 351 F.3d 919, 923 (9th Cir. 2003); see

15  also Calderon v. U.S. Dist. Court for Cent. Dist. Of Cal. (Kelly), 163 F.3d 530, 541 (9th Cir.

16  1998) (mental incompetency considered an extraordinary circumstance beyond the prisoner's

17  control) (overruled on other grounds by Woodford v. Garceau, 538 U.S. 202, 206, 123 S.Ct. 1398

18  (2003)).  A petitioner's mental illness tolls the limitations period only if "the illness in fact

19  prevents the sufferer from managing his affairs and thus from understanding his legal rights and

20  acting upon them."  Miller v. Runyon, 77 F.3d 189, 191 (7th Cir. 1996).

21          The Ninth Circuit has noted that "[d]etermining whether equitable tolling is

22  necessary is a 'fact-specific inquiry,'" Spitsyn, 345 F.3d at 799, but petitioner provides nothing

23  by way of any affidavit by a medical professional or any medical record to support any claim that

24  he was impeded by his mental health condition from filing his petition much earlier.  The only

25  reference to mental health issues is with respect to the claim that the trial court violated due

26  process in accepting the plea to first degree murder while rejecting the conclusions of the only

16

psychological evaluation of petitioner in the record without ordering a further or independent

evaluation and with regard to the IAC claim against trial counsel for failing to object.   At the

sentencing hearing, the judge references Dr. Shawn Johnston's twelve-page psychological

evaluation, dated November 8, 1993,[17] and indicates that it was received and considered, noting

that in the Rorshach Ink Blot Test, the doctor concluded that either petitioner (then defendant)

"was being very defensive or refusing to cooperate with the test, or that possibly the test results

show some type of emotional disturbance" and that in the Minnesota Multi-Phasic Personality

Inventory (MMPI), he came to two different conclusions, "that the tests either show that he

attempted to feign some type of an illness, was malingering, or that he suffers from a

schizophrenia or mania," opting for and adopting the latter conclusion and determining that

petitioner "may not have been able to deliberate the commission of the instant offense," finding

somehow that petitioner had "premeditated but not deliberated" the offense.   Lodged Doc. 1, pp.

3, 17, 22.  The sentencing judge "strongly disagree[s]" with that conclusion which he

characterizes as speculative at best based on the tests given, finding "ample evidence in the

record to show premeditation, deliberation, malice aforethought on the part of both defendants."

Lodged Doc. 1, pp. 22-23.   Both petitioner and respondent argue for their separate positions, as

noted above, that petitioner has never received mental health treatment based on the diagnosis of

schizophrenia since being incarcerated, each seeking to show that petitioner, who has indicated

that he signed himself up for CCCMS, has either never received the treatment he needs or has

never been diagnosed as schizophrenic in prison, respectively.   Respondent's inclusion of

petitioner's prison work history undermines any representation that mental health issues may

have impeded petitioner.  In 1996, petitioner was assigned work as a dining porter; in 1997,

petitioner was assigned work as a photographer/camera man; he progressed from C's to  B's and

A's in education progress reports in quarters from 2000-2002, in vocational, mostly electronic-

---

[17] As noted previously, neither petitioner nor respondent appears to have identified the location of Dr. Johnston's report itself in the record, or otherwise to have separately submitted it.

1   related technical courses.  Lodged Doc. 34.

2            Petitioner is not entitled to equitable tolling, or a later commencement of the

3   limitations period, for the purpose of attempting to prove that he is actually innocent of first

4   degree murder.  He simply had early access to the information he would now posit as proof of his

5   innocence, and no justifiable reason for not asserting this claim in a timely fashion.  To the extent

6   that petitioner contends that a claim of actual innocence, even if partial, will, on its own, always

7   trump the AEDPA statute of limitations, that claim is rejected for the reasons set forth below.

8            *Actually Innocent of Murder Per Se*

9            Petitioner relies on Schlup v. Delo, 513 U.S. 298, 115 S. Ct. 851 (1995), although

10  he acknowledges that that case involved a jury verdict as opposed to a guilty plea.  Petitioner

11  maintains that he is actually innocent of the first-degree murders to which he entered a plea based

12  on the co-defendant's belated statement, following his (the co-defendant's) religious conversion,

13  that it was he who was responsible for shooting the victims.  The standard under Schlup, at 329,

14  115 S. Ct. at 868, is not met by "a showing that a reasonable doubt exists in the light of the new

15  evidence, but rather that no reasonable juror would have found the defendant guilty."  Petitioner

16  maintains that he should proceed under Schlup because he has been subjected to constitutional

17  violations that have resulted in his conviction even though he is actually innocent, at least of first

18  degree murder, and that in light of the new evidence no reasonable juror would have convicted

19  him.  Opp., pp. 1-2.  Of course, as noted, in this instance petitioner essentially convicted himself.

20            Respondent argues that the gateway provided by Schlup is a very narrow

21  procedural one not applicable in the AEDPA statute of limitations context.   Reply, p. 4.  Schlup,

22  supra, at 315, 115 S. Ct. 861, a capital case, involved the applicable standard for overcoming a

23  procedural bar, the claim of actual innocence itself not being a constitutional claim, but rather "a

24  gateway through which a habeas petitioner must pass to have his otherwise barred constitutional

25  claim considered on the merits [internal quotation omitted]."  Respondent is correct that neither

26  the Supreme Court nor the Ninth Circuit has yet reached the conclusion that the strenuous Schlup

18

1    "fundamental miscarriage of justice standard" is adequate to override or even to be applied to the

2    statute of limitations set forth in the AEDPA statute.  Reply, pp. 3-4, citing <u>Majoy v. Roe</u>, 296

3    F.3d 770, 775-76 (9th Cir. 2002).

4            <u>Majoy</u> does not answer the question, should petitioner fall within that "narrow

5    class implicating a fundamental miscarriage of justice[,] ....whether surviving the rigors of this

6    gateway has the consequence of overriding AEDPA's one-year statute of limitation...."  <u>Majoy</u>

7    <u>v. Roe</u>, 296 F.3d at 776.  Indeed, the <u>Majoy</u> court expressly found that that question had not been

8    reached either in the Ninth Circuit or by the U.S. Supreme Court, <u>id</u>., *and that it was premature*

9    *for the <u>Majoy</u> court to decide the legal issue unless and until the district court found that its*

10   *petitioner could actually pass through the <u>Schlup</u> gateway*.  The district court was to have first

11   crack at the legal issue as well.  Thus, the undersigned finds this case in precisely the same

12   posture as <u>Majoy</u> at the time of remand.[18]

13           The U.S. Supreme Court has yet to finally determine that actual innocence itself

14   implicates a federal constitutional right entitling a petitioner to release upon proof of same.  <u>See</u>,

15   <u>District Attorney's Office for Third Judicial District v. Osborne</u>, ___ U.S.___, 129 S. Ct. 2308,

16   2321-2322 (Jun. 18, 2009), where the high court notes that it has "assumed, *arguendo*, that it

17   exists while also noting the difficult questions such a right would pose and the high standard any

18   claimant would have to meet," citing, inter alia, <u>House v. Bell</u>, 547 U.S. [518,] 554-555, 126 S.

19   Ct. 2064 [, 2086-87 (2006)];  <u>Herrera v. Collins</u>, 506 U.S. [390,] 398-417, 113 S. Ct. 853[, 869-

20   70) (1993)].

21           The Ninth Circuit has "noted, however, a majority of the Justices in *Herrera*

22   would have supported a claim of free-standing actual innocence."  <u>Jackson v. Calderon</u>, 211 F.3d

23   1148, 1165 (9th Cir. 2000), citing <u>Carriger v. Stewart</u>, 132 F.3d 463, 476 (9th Cir. 1997), cert.

24   denied, 523 U.S. 1133, 118 S. Ct. 1827 [](1998).  In "asserting a freestanding innocence

25   _____

26           [18] The undersigned is unaware of any published opinion after remand.

1   claim....," a petitioner "must go beyond demonstrating doubt about his guilt, and must

2   affirmatively prove that he is probably innocent."  Jackson, supra, at 1165, quoting Carriger, at

3   476.  Of course, all of these were cases wherein the petitioner had been tried and convicted and,

4   in all but one, sentenced to death,[19] not as here, a petitioner who had pled guilty (with the

5   exception of District Attorney's Office, supra, a § 1983 action wherein it was found that an

6   individual, duly convicted at trial with his conviction and sentenced affirmed on appeal, did not

7   have a federal substantive due process right to have state DNA evidence tested to prove his

8   innocence).[20]

9           This court has at times noted in the context of the equitable tolling inquiry that the

10  limitations period may be equitably tolled, or simply not applied, in a situation where the habeas

11  petitioner makes a colorable demonstration of actual innocence.  See Miller v. Marr, 141 F.3d

12  976, 978 (10th Cir. 1998) (intimating that the AEDPA limitations period may be unconstitutional

13  if a claim of actual innocence were at stake); United States v. Zuno-Acre, 25 F. Supp. 2d 1087,

14  1099-1100 (C.D.Cal. 1998) (holding that there is a "miscarriage of justice gateway" to non-

15  application of the AEDPA limitations period).  Some courts have suggested that dismissal of

16  actual or legal innocence claims on grounds that they are barred by the statute of limitations

17  violates the Suspension Clause (U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas

18  Corpus may not be suspended, unless when in Case of Rebellion or Invasion the public Safety

19  may require it.")).  See Rodriguez v. Artuz, 990 F.Supp. 275, 283 (S.D.N.Y. 1998), affirmed, 161

20  F.3d 763 (2nd Cir. 1998) ("where no claim of actual or legal innocence was raised, as long as the

21  procedural limits on habeas leave petitioners with some reasonable opportunity to have their

22  claims heard on the merits...[there is no] suspension of the writ.") See also Johnson v. Knowles,

23  541 F.3d 933 (9th Cir. 2008), where the parties assumed the applicability of Schlup to a statute of

24
      [19] Majoy was sentenced to life without parole, not death.  Majoy, supra.
25
      [20] Osborne had confessed to some of his crimes in an application for parole and repeated
26  his confession to the parole board.  Id., at 2314-2315.

1    limitations issue, and so therefore did the court.

2           However, upon analysis of the AEDPA statute itself, the undersigned concludes

3    that actual innocence does not provide an exemption to bringing claims in a diligent fashion.

4           The First Circuit has opined, in <u>David v. Hall</u>, 318 F.3d 343, 347 (1st Cir. 2003):

5           Nothing is changed here by David's claim of actual innocence, a
            claim itself derived from his mistaken-colloquy argument. In
6           general, defendants who may be innocent are constrained by the
            same explicit statutory or rule-based deadlines as those against
7           whom the evidence is overwhelming: pre-trial motions must be
            filed on time, timely appeals must be lodged, and habeas claims
8           must conform to AEDPA.  In particular, the statutory one-year
            limit on filing initial habeas petitions is not mitigated by any
9           statutory exception for actual innocence even though Congress
            clearly knew how to provide such an escape hatch.

10

11          The court is persuaded by the <u>David</u> rationale that claims of actual innocence are

12   required to be brought diligently the same as any other claim.  <u>See also</u>, <u>Araujo v. Chandler</u>, 435

13   F.3d 678, 681 (7th Cir. 2005) (finding "actual innocence" claim must fit within the provisions of

14   § 2244(d)(1)(D) to be timely and that petitioner did not exercise due diligence in bringing facts of

15   claim to federal court)[21]; <u>Flanders v. Graves</u>, 299 F.3d 974, 978 (8th Cir. 2002) (while not holding

16   that actual innocence is irrelevant in the equitable tolling context, finding that a petitioner would,

17   at a minimum, have to show diligence); <u>Cousin v. Jenning</u>, 310 F.3d 843, 849 (5th Cir. 2002)

18   (finding no explicit exemption for actual innocence claim under § 2244(d) and such claims

19   relevant to timeliness only if they warrant equitable tolling of the limitations period); <u>Felder v.</u>

20   <u>Johnson</u>, 204 F.3d 168, 171 (5th Cir. 2000) ("actual innocence claim ...does not constitute a 'rare

21   and exceptional circumstance....'").

22          Indeed, the AEDPA statute of limitations *does not even commence to run* until the

23   factual predicate for the claim could have become known with reasonable diligence.  28 U.S.C. §

24   2244(d)(1)(D).  It becomes absurd to think that one who knows, or should know, of a claim for

25

26          [21] The Seventh Circuit has also determined that "actual innocence is not a freestanding
     exception to the statute."  <u>Araujo</u>, <u>supra</u>, at 682.

21

1   actual innocence may pocket the claim, and only spring it years or decades after the fact.  In

2   essence, a suspension or ignoring of the AEDPA statute of limitations is not necessary for claims

3   of actual innocence.  If petitioner had knowledge of the factual predicate of his claim of actual

4   innocence years ago, as he must have if it is true, or should have had such knowledge years ago,

5   his lack of diligence precludes him (and *should* preclude him) from proceeding at present.

6   Congress anticipated newly discovered factual predicates, including those for actual innocence

7   claims, and provided for such in the AEDPA limitations statute itself.

8           Thus, in a situation, for example, where DNA evidence is newly discovered, or a

9   new testing procedure is discovered, which was not available at the time of trial, or even initial

10  post-trial proceedings, and which would prove actual innocence, the AEDPA limitations period

11  would not start to run until the discovery of such evidence or procedure.  But there is no reason

12  to allow a petitioner to sit on such evidence after discovery until such time as petitioner feels the

13  time is right to bring it.

14          In reviewing the facts here, petitioner must have been aware, if it is true, that he

15  knew all along that he had confessed to a crime he did not commit, and that his guilty plea was

16  erroneous, petitioner going so far as to inform the judge on guilty plea colloquy that he indeed

17  committed the crime.  Yet, petitioner did nothing for years to rectify the matter.  Petitioner's co-

18  defendant's belated "I'll now take the blame" declaration, should have been actively sought long

19  before the time it just happened to come into existence because of a purported religious impetus.

20  The foregoing is *not* a situation where the presently asserted factual predicate was unknown to

21  petitioner, or legally unavailable, at the time he inculpated himself.

22          Petitioner claims that he was likely suffering from schizophrenia at the time of the

23  shootings, per the "uncontroverted opinion" of Dr. Johnston, which "would be a likely

24  explanation for the misinformation that appears to have been spread regarding the shooting in the

25  immediate hours and days thereafter...."  Supp. Resp. in Opp., p. 3.  That is, petitioner attributes

26  most of the misinformation as having its primary source in the co-defendant and seeks to ascribe

22

1    petitioner's own self-incrimination to the alleged schizophrenia from which petitioner may have

2    suffered at or around that time.  Even if colorable, and the state trial court and this court has

3    found it not to be so, none of this explains petitioner's subsequent extended dilatoriness.

4              Petitioner claims that he moved forward diligently with his claim of actual

5    innocence once he obtained his co-defendant's "confession."  Opp., p. 18.  He also posits that it

6    was only upon a chance meeting with his co-defendant that he learned of his conversion to Islam

7    and that therefore a truthful statement could be obtained, something he could not otherwise have

8    known.  Ptnr's Dec. in Opp., ¶ 10.  Further, he maintains that he could not simply contact another

9    inmate without institutional approval, and that contacting a former co-defendant would be even

10   more problematic.  Id.  Respondent submits a copy of the CDCR policy regarding

11   correspondence between inmates.  Lodged Doc. 36.  To have initiated the process might have

12   been an onerous one for petitioner, but despite his avowed innocence, petitioner does not indicate

13   that he ever explored the process before his fortuitous meeting with Inmate Mann.  If petitioner

14   was aware, as he must have been if it is true, that he did not know his co-defendant had a gun on

15   the crucial night and that he (petitioner) was not the gunman in the fatal shootings, he was also

16   aware of this, not only as he spoke to friends prior to his arrest, entered his plea, and had his

17   judgment and sentenced imposed, and was no less aware of it as he languished in prison for some

18   ten years before running into the former co-defendant.  Without the declaration from his co-

19   defendant, petitioner has a point that he is unlikely, certainly given all the circumstances, that he

20   could have made any colorable showing of innocence of first degree murder.  Petitioner's counsel

21   argued at the hearing that even respondent has conceded that (see Reply, p. 5), under Sawyer v.

22   Whitley, 505 U.S. 333, 340, 112 S. Ct. 2514 (1992),[22] a credible declaration of guilt made by

23

24       [22] This case involved an inmate under sentence of death who brought a successive petition
     alleging actual innocence, the high court noting a prior holding that even if a state prisoner could
     not meet the cause and prejudice standard, the court could hear the merits of successive claims if
25   the failure to do so "would constitute a 'miscarriage of justice,'" but that the fundamental
     miscarriage of justice exception has a "narrow scope."  Id., at 339-340, 112 S. Ct. at 2518-19.
26   The Supreme Court held that petitioner therein "has failed to show by clear and convincing

another may establish factual innocence.  Even assuming the declaration that petitioner's co-defendant has belatedly provided petitioner has any credibility, however, petitioner cannot virtually abandon any claim of actual innocence for a decade without any evidence of any effort in the record to seek to establish it.

Even if one were to impose the Schlup paradigm on the instant facts, permitting petitioner to raise his actual innocence whenever he felt it advantageous to do so, a requirement of the paradigm is that petitioner must establish that he is in fact innocent to overcome the limitations bar.  See Johnson v. Knowles, supra, denying the attempt to overcome the limitations bar because petitioner did not prove his actual innocence.

In initially denying petitioner's claim in a 2004 petition that newly discovered evidence showed a miscarriage of justice, the Sacramento Superior Court stated, in relevant part:

> Petitioner claims that his co-defendant Phillip Mann absolved Petitioner of any culpability in the double homicide.  The alleged newly discovered evidence is a statement (not signed under penalty of perjury) of Phillip Mann stating the Petitioner was not involved in the double homicide and that detectives coerced statements from Mann wrongfully incriminating Petitioner.  First, the statement was not made under penalty of perjury and is therefore inadmissible as well as unreliable.  Second, Petitioner pled guilty in both counts, admitting all of the elements of the offenses, so Mann's statement does not point unerringly to innocence of [sic] reduced culpability for Petitioner.  Therefore, petitioner has not shown that there is newly discovered evidence supporting habeas relief.

Lodged Doc. 5.

Upon petitioner's motion for reconsideration after evidently making an effort to submit the statement by Mann under penalty of perjury, the court concluded:

> The submitted documents purport to make the statement under penalty of perjury.  Regardless of whether or not the affidavit is admissible, the petitioner was denied for the additional and independent reason that Petitioner's guilty plea admitted all of the elements of the offense.  Therefore, Petitioner has not stated any valid reason for reconsideration of the Court's previous denial of

evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty under" under the applicable state law.  Id., at 350, 112 S. Ct. at 2525.

1    the motion.

2    Lodged Doc. 7.

3          The ruling of the court is not contrary to, or an unreasonable application of,

4    clearly established federal law.  Nor is an evidentiary hearing on his claim to entitlement to

5    equitable tolling warranted where further factual development is unnecessary.  "It follows that if

6    the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a

7    district court is not required to hold an evidentiary hearing."  Schiro v. Landrigan, supra, 550

8    U.S. 465, 474, 127 S.Ct. 1933, 1940.  "We have previously held that a district court in a habeas

9    corpus proceeding "'need not conduct full evidentiary hearings,'" but may instead "'expand the

10   record ... with discovery and documentary evidence.'"  Williams v. Woodford, 384 F.3d 567, 590

11   (9th Cir. 2004).  In this instance the court has expanded the record to include the preliminary

12   hearing transcript, a part of the record which significantly tends to undermine petitioner's claim

13   of actual innocence (see below).

14         The declaration evidently submitted by the co-defendant, which was not originally

15   signed under penalty of perjury, as pointed out by the state court, states that petitioner, on the

16   pertinent date, "had nothing to do with the matter...was a victim of circumstance....never had the

17   firearm in question," or knowledge of it.   Lodged Doc. 14, p. 3.  The co-defendant, Phillip

18   C(harles) Mann, goes on to assert that petitioner was implicated because both the detectives and

19   the prosecutor "coerced" him by promising leniency; he concludes that petitioner is "innocent of

20   all charges...." in the case.  Id.

21         Petitioner belatedly, and perhaps conveniently, maintains now that all the

22   circumstantial evidence for the shootings rested on Mann rather than on himself: the pistol used

23   was a recent purchase of Mann's; Mann hid the gun after the shootings; Mann had previously

24   threatened the life of the intended victim, his estranged girlfriend who was his child's mother;

25   Mann had previously pointed a gun at the intended victim; Mann had an assault case pending,

26   involving the intended victim as the assault victim; Mann was denied by the intended victim

visits with his child; Mann believed the actual victim in the park to be his ex-girlfriend with

another man; and Mann was angry with his ex-girlfriend over a supposed loss of $4,500.00 worth

of home furnishings to her.  Opp., p. 17; see also, petitioner's July 31, 2009, supplemental

response in opposition (docket # 72), pp. 2-3.   In addition, it was Mann who was the driver on

the night of the shootings and the one who drove to retrieve the pistol from his house and then

back to the park where he thought he had seen the intended victim with her friend, and Mann's

mother had lent the intended victim $7,000.00 which she could not get back.  Opp., p. 18; Supp.

Resp. in Opp., p. 3.

However, as respondent points out, the evidence of petitioner's guilt was

"overwhelming."  Reply, p. 5.  The factual basis at the time of petitioner's change of plea set

forth the following:

> [On] May 31st of this year, Mr. Chestang and another individual
> by the name of Phillip Mann were in the area of Vintage Park in the
> southeast portion of Sacramento County when they – late at night,
> about eleven or twelve o'clock at night, when they saw two people
> in the park who they perceived to be Mr. Phillip Mann's prior girlfriend,
> a young lady by the name of Michelle Brown, and a young man that she
> was talking to who – who raised some notions of jealousy on the part of
> Mr. Mann.
>
> Mr. Mann and Mr. Chestang then obtained a pistol, stalked the
> victims in the park by driving around the park with their lights out.
> Eventually Mr. Chestang got out of the vehicle, entered the park,
> approached the two people in the park, spoke to them briefly, and
> then shot them both with a pistol.
>
> It turned out that the two people in the park were not Michelle Brown
> or anybody associated with Michelle Brown. It was entirely innocent
> individuals who happened to look like Michelle Brown, Sidney Newman
> and Marlena Ann Brooks, both of whom were – were killed by the
> gunshots fired by Mr. Chestang.
>
> The evidence indicates that Mr. Chestang and Mr. Mann gave –
> planned this.  They discussed it in the car before Mr. Chestang got out
> and actually approached the victims and shot them. They obtained a gun
> for the specific purpose that evening of shooting the two people in the
> park. Therefore, there is evidence of premeditation and deliberation.

Reply, pp. 5-6, quoting Lodged Doc. 32, pp. 4-5.

26

1   As respondent points out, petitioner, when given an opportunity to comment on the prosecution's

2   summary of the evidence, declined, saying "No, sir," when asked by the judge if he wished to do

3   so.  Lodged Doc., p. 5.  At the preliminary hearing, several of petitioner's and the co-defendant's

4   friends/acquaintances testified either to co-defendant Mann's having informed them, in

5   petitioner's presence, that petitioner had shot the victims, or to petitioner himself directly having

6   detailed the shootings and where the gun came from.  Docket # 67, pp. 65-66,[23] 88-92, 102-107.

7   The witnesses recounted how Mann and petitioner asked them to provide an alibi for their

8   whereabouts at the relevant time.  Id., pp. 62-63, 88, 92, 107-108.  One witness described how

9   petitioner told him that Mann had gotten scared and that it was he, petitioner, who had

10  approached the victims and asked if they had seen a dog before he shot the girl three times and

11  the man twice.  Id., at 89-90.  Petitioner, in his supplemental opposition, contends that this

12  alleged assertion of petitioner's testified to by another at the preliminary hearing was belied by

13  the testimony of the investigating deputy who found only three shell casings in the area,

14  maintaining that believing petitioner's alleged confession requires believing that he could have

15  been wrong on such a "critical factual point," a point on which only "the true shooter is likely to

16  have the correct knowledge regarding."  Supp. Resp. in Opp., p. 3.  The court's review of the

17  transcript reveals that Sacramento County Sheriff's Deputy Paul Spreitzer (a homicide bureau

18  detective) testified to an approximation, that is, when asked if he had located any spent casings in

19  the vicinity of the victims' bodies and to state how many "approximately," he stated: "I believe it

20  was three."  Docket # 67, pp. 9, 20.  He also testified that the male victim had died of a gunshot

21  wound to the chest, without clarifying whether he was shot once or twice.  Id., at 18.  The

22  detective's testimony does not clarify precisely how many times either victim was shot.  He

23  additionally did testify to his observation of "a small amount of blood" on the female victim's

24  head at the crime scene.  Id., at 12.  This could be taken to corroborate petitioner's evident

25  

26      [23] Again, the court references the pagination of the court docketing system.

representation, as testified to by an acquaintance of his named DeShawn Mays, that he believed petitioner had said he had shot her "in the back of her head." Id., at 103-104.  The detective's limited preliminary hearing testimony does little to undermine petitioner's original guilty plea.

Petitioner is far from actually innocent, and his proffer, even utilizing a <u>Schlup</u> rationale, is insufficient to relieve him of the statute of limitations.

*Conclusion*

Accordingly, IT IS HEREBY RECOMMENDED that respondent's August 8, 2008 (docket # 49) motion to dismiss be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 18, 2009

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
ches1173.mtd

28